CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BERGER, BURTON, and FEBBO
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant CALVIN R. GIBBS**
**United States Army, Appellant**

ARMY 20110998

Headquarters, I Corps (Rear) (Provisional) (convened)
Headquarters, I Corps (action)
U.S. Army Combined Arms Center and Fort Leavenworth (*DuBay* Hearing)
Kwasi Hawks, Military Judge (trial)
J. Harper Cook, Military Judge (*DuBay* Hearing)
Lieutenant Colonel John T. Rawcliffe, Acting Staff Judge Advocate (pretrial)
Colonel William R. Martin, Staff Judge Advocate (recommendation & addendums)

For Appellant: Phillip Stackhouse, Esquire (argued); Captain Patrick A. Crocker, JA; Phillip Stackhouse, Esquire (on brief); Captain Jennifer K. Beerman, JA.

For Appellee: Captain Anne C. Hsieh, JA (argued); Major A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Anne C. Hsieh, JA (on brief).

28 June 2018

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FEBBO, Judge:

Appellant was one of the squad leaders of a remarkably ill-disciplined platoon deployed to Afghanistan between 2009 and 2010. While deployed, he and other members of the platoon conspired to kill Afghan noncombatants by staging the killings as lawful lethal engagements. Amongst other offenses, this conspiracy resulted in the separate murders of three Afghan males.

A military panel sitting as a general court-martial convicted appellant, contrary to his pleas, of three specifications of conspiracy (one to commit premeditated murder, one to commit battery, and one to commit aggravated assault with a dangerous weapon), three specifications of premeditated murder, assault[1] consummated by battery, aggravated assault with a dangerous weapon, wrongful possession of bones and a tooth taken from Afghan corpses, wrongful solicitation of another to cut the finger off a corpse, two specifications of obstruction of justice, two specifications of dereliction of duty, and failure to obey a lawful general order, in violation of Articles 81, 92, 118, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 918, 928, and 934 (2006) [UCMJ]. The convening authority (CA) approved the adjudged sentence of a dishonorable discharge, confinement for life with eligibility for parole, forfeiture of all pay and allowances, a reprimand, and reduction to the grade of E-1.

After remand pursuant to *United States v. DuBay*, 17 U.S.C.M.A 147, 37 C.M.R. 411 (1967), this case is again before us for our Article 66, UCMJ, review. We determine the charges and their specifications are legally and factually sufficient. We also determine the CA did not abuse his discretion under Rule for Courts-Martial [R.C.M.] 1102 and that the government did not commit a post-trial *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963).[2] Lastly, we hold appellant did not petition for a new trial and is therefore not entitled to a new trial, and that even if we were to construe his assignments of error as a request for a new trial based on newly discovered evidence, the post-trial testimony provided by the two co-conspirators does not meet the requirements of R.C.M. 1210.

## BACKGROUND

As with any complicated, multiple-witness trial, there are inconsistencies in the testimony and evidence presented. While recognizing that the trial court saw

---

[1] Corrected; this line was inadvertently deleted from previously served copy.

[2] Appellant assigned multiple errors to include the factual and legal insufficiency of his convictions of: conspiracy to commit premeditated murder; conspiracy to commit aggravated assault; the three specifications of premeditated murder; and the aggravated assault. Appellant also asserts that the CA abused his discretion by denying the defense request for a post-trial hearing regarding newly-available exculpatory evidence and that the government committed a post-trial *Brady* violation. While we address each of these issues in turn, we have also considered the matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and determined they do not warrant discussion or relief.

and heard the witnesses, under our Article 66(c), UCMJ, authority to resolve controverted questions of fact, we make the following factual findings.

### A. *Unit Conditions at Forward Operating Base Ramrod, Afghanistan*

Appellant deployed from the Republic of Korea to Afghanistan in 2009 with the 5th Stryker Brigade Combat Team (SBCT). During the deployment, appellant moved to a platoon at Forward Operating Base (FOB) Ramrod to serve as a squad leader. Prior to appellant arriving at FOB Ramrod, the platoon had only engaged and killed one Taliban fighter. However, the unit had experienced several Improvised Explosive Device (IED) attacks and while on patrols routinely saw "squirters," suspected Taliban fighters fleeing from engagement on motorcycles. The platoon was generally frustrated with their inability to directly engage the Taliban in combat.

This frustration was combined with a remarkable lack of platoon discipline. A number of soldiers routinely smoked hashish. Appellant was aware of and condoned the drug use, even though he did not use drugs himself. The platoon also had lax grooming standards and had several disengaged officer and non-commissioned officer (NCO) leaders that condoned misconduct in the company.[3] For example, a platoon leader allowed members of the unit to mutilate an Afghan corpse and take pictures with the body.

Around December 2009, a well-liked NCO in the platoon lost his leg in an IED attack and had to be medically evacuated from Afghanistan. Prior to the attack, the NCO had volunteered to go on the patrol while appellant remained at the FOB. Appellant felt remorse for not going on the patrol. This particular attack greatly added to the frustration of the platoon.

### B. *The Agreement to Kill Unarmed Afghans*

On several patrols, appellant commiserated with Corporal (CPL) Jeremy Morlock, a member of another squad within appellant's platoon, about the IED attack.[4] Appellant resented not only the Taliban and enemy insurgents, but Afghans

---

[3] This is not intended to be a critique of everyone assigned to the B Company, 2d Battalion, 1st Infantry Regiment during the deployment.

[4] Corporal Morlock, and other Soldiers from the platoon were later reduced to Private (E-1) at their courts-martial. To make it easier to follow the rank structure of the platoon at the time of the offenses, the soldiers will be referred to by their rank at that time.

in general. Appellant referred to them as "savages" and other derogatory terms, believing they should be killed. Over the course of several conversations, appellant's hatred eventually led him to discuss the prospect of murdering unarmed Afghans. Appellant told CPL Morlock that on a previous deployment to Iraq he had unlawfully killed the occupants of a vehicle at a checkpoint and subsequently lied to his command by claiming it had been a lawful engagement.

Appellant and CPL Morlock discussed fabricating similar "scenarios" in order to justify unlawfully killing local Afghans. In one scenario, a "drop weapon" could be planted on a body to make it look like an Afghan died while engaged in hostile acts against the platoon. Another scenario involved detonating a grenade to make it appear as if the murdered Afghan had thrown the grenade. They agreed the scenarios would be more believable if the killings occurred in pro-Taliban villages and involved military-age males.

Eventually, CPL Morlock and appellant included Staff Sergeant (SSG) David Bram and Sergeant (SGT) Darren Jones in their discussions about killing noncombatant Afghans. Appellant and CPL Morlock also discussed the planned scenarios with other platoon members, including Private First Class (PFC) Andrew Holmes, Specialist (SPC) Adam Winfield, SPC Michael Wagnon II, CPL Emmitt Quintal, PFC Ashton Moore, SPC Adam Kelly, and SPC Corey Moore. Some of the junior soldiers were motivated by the prospect that the staged killings could earn them Combat Infantryman Badges, awards, and the ability to tell combat stories. Appellant asked other soldiers in the platoon about their thoughts on being part of a "small kill team," being part of "black ops," and killing unarmed civilians with grenades and Claymore mines.

Ultimately, appellant contacted an NCO from another unit on the FOB and obtained a crate of grenades without going through his platoon's resupply system. Appellant did not add them to his platoon's accountability records. In December 2009, appellant gave CPL Morlock one of these off-the-books grenades.

### C. Murder of an Unarmed Afghan Civilian at La Muhammad Kalay

On 15 January 2010, CPL Morlock and PFC Holmes were patrolling the village of La Muhammad Kalay when they saw several Afghan males working in a field. They had an interpreter call one of the Afghans to them and then dismissed the interpreter. The Afghan stood twenty feet away from them on the other side of a waist-high wall while they discussed implementing the grenade scenario. The Afghan never displayed any hostile intent or committed a hostile act. Corporal Morlock then activated the off-the-books grenade, dropping it over the wall, and PFC Holmes shot the Afghan with his automatic weapon.

Appellant and other members of the platoon, including SSG Bram, ran towards the sound of the grenade explosion and weapons fire. There were lines of white powder on the ground, indicating use of a U.S. grenade. Staff Sergeant Bram kicked dirt around, erasing the white film. Platoon members searched the dead body and found no weapons or ammunition. Appellant cut off a finger from the body and the next day gave it to PFC Holmes as a trophy because PFC Holmes was the one who shot the Afghan. Later, CPL Morlock apologized to appellant for implementing the scenario without him. Appellant replied, "Well, you know, no problem. You did a good job. You did exactly what we talked about."

### D. Appellant Obtains an AK-47 Drop Weapon

In January 2010, an Afghan National Police (ANP) vehicle was struck by an IED outside of FOB Ramrod. Appellant recovered an AK-47 and magazines from the IED site. The AK-47 was made with black material and metal, and had a collapsible assault-style stock. Initially, appellant and CPL Morlock discussed using the AK-47 in a similar manner as the off-the-books grenade, but decided to let SSG Bram come up with a plan. The AK-47 was kept in a storage compartment of SSG Bram's Stryker vehicle. Staff Sergeant Bram, CPL Quintal, and CPL Morlock discussed potentially using the AK-47 as a drop weapon after engaging a "squirter." After this plan failed to materialize, appellant and CPL Morlock discussed finding an isolated Afghan, killing him, and staging the AK-47 afterward.

### E. The Conspiracy Begins to Unravel

In February 2010, SPC Winfield, appellant's vehicle commander, left their Stryker unsecured. As a result, appellant chastised SPC Winfield and made him do physical exercises. In turn, SPC Winfield got mad and told appellant he "quit" as the vehicle commander. Appellant, later, told CPL Morlock he was concerned SPC Winfield might reveal the murders. Appellant also spoke with SPC Winfield, told him not to say anything, and told him "you know what will happen if you do." Specialist Winfield understood this to be a threat that he would be killed.

On 14 February 2010, SPC Winfield sent his parents Facebook instant-messages.[5] He informed them that he got in trouble for leaving his Stryker unlocked and quit his job as vehicle commander. Specially, he wrote: "i cannot work for my squad leader who punishes me for leaving a Stryker unlocked and gives high fives to the guy who kills innocent people and plans more with him." He told his father an

---

[5] These Facebook messages were retrieved from SPC Winfield's parents' computer. His parents and sister testified about the exact date of the messages. Since the date was also Valentine's Day, they were sure of the date.

Afghan farmer was murdered the previous month by making it look like the Afghan threw a grenade. He informed his father the whole platoon knew it was staged. He did not know who to trust, was thinking about speaking to a chaplain, but was already receiving threats. He suggested that his father could go to the Army Inspector General or Criminal Investigation Command (CID). He explained to his father, "well if you talk to anyone on my behalf i have proof they are planning another one [murder] in the form of an ak47 they want to drop on a guy." His father was afraid for his son's safety. Specialist Winfield told his father he thought he convinced his platoon he was not going to say anything.

### F. *Murder of Unarmed Afghan Civilian at Kari Kheyl*

On 22 February 2010, the platoon went on a mission to Kari Kheyl village. The perception that Kari Kheyl was a source of Taliban activity lent itself to a scenario. While preparing to leave FOB Ramrod, appellant and CPL Morlock discussed isolating an individual in the town, killing him, and then planting the AK-47 acquired from the ANP on the body. They hid the acquired AK-47 and magazines in appellant's assault pack. The AK-47 did not initially fit, so they removed the flash suppressor and forced the assault pack closed.

Upon entering the village, appellant, the platoon leader, and other members of the unit met with the village elders. Later, appellant escorted an unarmed Afghan male to CPL Morlock's position. At the time, CPL Morlock was with SPC Michael Wagnon securing the outside of a compound. Appellant asked CPL Morlock and SPC Wagnon if they wanted to "smoke this guy." All three agreed to kill the Afghan and make it appear the Afghan fired on appellant with the AK-47.

Appellant then entered into the compound. Specialist Wagnon and CPL Morlock waited outside the entry, but CPL Morlock could still see appellant. The Afghan never displayed any hostile intent or committed a hostile act. Appellant fired rounds into the wall by the entry, making it appear the Afghan had shot in appellant's direction. Appellant then shot the Afghan. Appellant then dropped the AK-47 near the Afghan. Specialist Wagnon and CPL Morlock then entered the compound and also shot at the Afghan. The Afghan was killed.

Another squad leader in the platoon, SSG Kris Sprague, heard the gun fire and arrived first at the scene of the shooting. Appellant reported the Afghan shot at him and then the Afghan's weapon "jammed," allowing appellant to return fire.

Staff Sergeant Sprague was an AK-47 enthusiast and recognized the weapon by the Afghan as a Hungarian AMD 65 that was used by the ANP. Staff Sergeant Sprague retrieved the AK-47 and carried it while clearing the compound. No other weapon or ammunition was found in the compound. He initially noticed the weapon was on safe and later, when clearing the weapon, determined it did not have a round

in the chamber. The AK-47 was missing a hand guard, sling, and flash suppressor ("muzzle break"). Staff Sergeant Sprague requested permission to fire the weapon because he had never had an opportunity to fire an AK-47 in full automatic. Appellant tried to dissuade him from firing the weapon, stating it may have defective or dangerous ammunition. However, SSG Sprague fired a burst from the AK-47. It did not malfunction.

After the squad searched and took identifying data from the body, appellant cut off one of the Afghan's fingers with a pair of trauma shears, keeping it as a trophy. The Afghan was placed in a body bag. As the platoon left Kari Kheyl, they came under direct and indirect fire from mortars and small arms.

### G. Shooting at Unarmed Afghan Farmers

Appellant obtained an 81mm U.S. mortar round from an Afghan National Army (ANA) compound. At some point, he also obtained a rocket propelled grenade (RPG) round, a broken Claymore mine held together with duct tape, 20 to 30 feet of detonation cord, some C-4 plastic explosive, and an old Russian pineapple-style grenade. Appellant also tried to obtain a 9mm pistol through a trade with ANA soldiers. Appellant and CPL Morlock discussed using the explosives to create an IED and using the Russian grenade for a scenario.

Appellant contacted a friend, SSG Robert Stevens, a medic, about coming to FOB Ramrod on patrol with the platoon. Appellant informed SSG Stevens they would "find somebody to kill." Staff Sergeant Stevens volunteered to go to FOB Ramrod while the senior medic there was on leave. He went on patrol with appellant's platoon for approximately two to three weeks.

On 10 March 2010, SSG Stevens joined appellant on a dismounted patrol that included SGT Jones and SPC Wagnon. Two Afghan farmers were in a field and appellant placed the squad in a trench. Appellant could see the two Afghan males were unarmed, one was carrying a shovel, and neither displayed any hostile intent or committed a hostile act. Appellant pulled SSG Stevens aside, and told him to pull out the duct-taped Claymore mine in his assault pack. Appellant suggested they lure the males towards the squad and kill the Afghans with the Claymore. Staff Sergeant Stevens objected because he thought the Claymore would also kill them.

Appellant falsely shouted one of the Afghans was carrying an RPG. He counted down and gave the order to open fire on the two farmers. When fired upon, the two men ran away. As the squad went to search for the Afghans, appellant told SSG Stevens if both of the Afghans were killed, they would say a third Afghan must have run off with the RPG. Once in the field, an Afghan put his arms up and was searched. All he had was a shovel lying next to his feet. The squad did not believe he was one of the two individuals they had fired upon and released him. They did

7

not find any indication either of the males were killed or wounded. The squad did not find any weapons in the field—only the shovel.

### H. Murder of Unarmed Afghan Civilian at Qualaday

The village of Qualaday was just outside FOB Ramrod. Prior to May 2010, the platoon had patrolled the village and detained an Afghan male who had an IED in his house. The Afghan was subsequently released. On 2 May 2010, the platoon planned another patrol to this village. Appellant and CPL Morlock discussed looking for an opportunity to use the Russian pineapple grenade in a staged scenario. Before leaving the FOB, CPL Morlock also discussed the scenario with several other members of the platoon, including SPC Winfield and SSG Bram. However, SSG Bram informed appellant and CPL Morlock he was no longer interested in conducting scenarios.

While on patrol, CPL Morlock and SPC Winfield entered a small compound and were immediately greeted by an elderly Afghan male along with some children and a woman. Appellant arrived shortly thereafter and had the elderly gentlemen walk outside the compound. Appellant, CPL Morlock, SPC Winfield and SPC Corey Moore then discussed killing the Afghan and claiming the Afghan attacked them with two grenades.

Appellant, CPL Morlock, and SPC Winfield set-up around the elderly gentleman. Appellant, then, threw a grenade at the Afghan, blowing apart his legs. Corporal Morlock and SPC Winfield shot at the Afghan. Afterward, appellant walked over to the body and shot the Afghan twice in the head. Corporal Morlock placed the Russian pineapple grenade next to the Afghan's body. The pineapple-style grenade was the same one appellant previously obtained from the ANA base.

Corporal Morlock told the platoon leader that the Afghan had approached them with two grenades. He reported that he and SPC Winfield shot the Afghan and the Afghan dropped one of the grenades, blowing off his own legs. He informed the platoon leader he believed the other grenade was still by the Afghan's body. This grenade was the Russian pineapple grenade he had just planted. The platoon ultimately searched the body and found no other weapons or ammunition. Appellant later cut off a finger from the Afghan's hand and removed a tooth. The rest of the compound was searched and the platoon did not find any other weapons, ammunition, or military aged males.

While still at the site, appellant walked up to SPC Winfield and told him he was a "made man and [he] didn't have anything to worry about as far as [appellant]."

## I.  The Conspiracy is Exposed

In early May 2010, PFC JS became annoyed that members of his platoon smoked hashish in his Containerized Housing Unit (CHU).  He reported the drug use and the platoon subsequently learned of the report.  Members of the platoon including CPL Morlock and appellant agreed to deal with PFC JS and intimidate him to ensure he would not speak further with the command.

On 5 May 2010, appellant, CPL Morlock, SSG Bram, SPC Corey Moore, CPL Quintal, SGT Jones, and SPC Kelly went to PFC JS's CHU to confront him.  They discussed not hitting him above the neck so as not to leave any marks.  At first PFC JS denied speaking to the command, but eventually broke down under physical duress.  After admitting he informed the command about the drug use, appellant and the other soldiers punished PFC JS, holding him down and alternating between group and individualized threats and beatings.  They told PFC JS to keep his mouth shut before filing out of the CHU.

Later, appellant, CPL Morlock and another soldier PFC Michael LeCroy returned to reinforce their message.  Appellant pulled out two severed fingers and threatened to kill PFC JS if he did not keep his mouth shut.  They suggested a scenario where they could take PFC JS on a mission, execute him, and blame it on the enemy.  Private First Class JS had seen the fingers before and knew they came from dead Afghans.  Private First Class JS was afraid of the threats, and thought he would be killed.  He did not report the beating until pressured for an explanation by an NCO from another unit who discovered the injuries and bruises on his body.

## J.  CID Interviews and Search of FOB Ramrod

Based on PFC JS's reports CID opened an investigation.  On 11 May 2010, CPL Morlock, SPC Winfield, CPL Quintal, PFC JS, and appellant were transported to Kandahar Airfield (KAF) for questioning.  Explosive Ordnance Disposal conducted a search of FOB Ramrod.  They found the 81mm mortar and RPG round hidden in HESCO barriers near appellant's CHU.  CID also conducted a search and found two fingers and bones in the HESCO barriers near appellant's CHU and the duct-taped claymore mine in appellant's Stryker.

## K.  The Courts-Martial

A series of courts-martial followed.  Appellant was tried after all of the other trials except for the trials of SPC Wagnon and SSG Bram.  All of the tried soldiers that testified at appellant's trial were granted immunity.  Staff Sergeant Bram and SPC Wagnon's courts-martial were not completed at the time of appellant's trial, and they were never called as witnesses by either party.

**LAW AND DISCUSSION**

*A. Legal and Factual sufficiency*

Article 66(c), UCMJ, establishes our statutory duty to review a record of trial for legal and factual sufficiency de novo. *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003). We may affirm only those findings of guilty that we find correct in law and fact and determine, based on the entire record, should be affirmed. *Id*. The test for legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the government, a factfinder could rationally have found all of the essential elements of an offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Blocker*, 32 M.J. 281, 284-85 (C.M.A. 1991). In resolving questions of legal sufficiency, this court is "bound to draw every reasonable inference from the record in favor of the prosecution." *United States v. Craion*, 64 M.J. 531, 534 (Army Ct. Crim. App. 2006) (citations omitted).

In weighing factual sufficiency, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "[A]fter weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we must be] convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

*1. Appellant's Arguments and Legal Sufficiency*

Appellant asserts the evidence for the six most serious offenses is legally and factually insufficient. These offenses include conspiracy to commit murder, the underlying separate murders of three Afghans, conspiracy to commit aggravated assault, and the underlying aggravated assault of shooting at two Afghan farmers.

The crux of appellant's position is the testimony against him should not be believed. Appellant asserts CPL Morlock and SPC Winfield provided the only evidence that implicated him in any alleged murders or conspiracy to commit murder. Appellant states there was no evidence presented implicating him in any aggravated assault or conspiracy to commit aggravated assault. Appellant claims both the AK-47 incident and the shooting at farmers who allegedly had an RPG were lawful engagements. According to appellant, CPL Morlock is a liar, was biased against appellant, and had a motive to fabricate the allegations. Appellant asserts that CPL Morlock and other co-conspirators colluded to implicate appellant. Furthermore, CPL Morlock in particular, and other witnesses in general, were under the influence of hashish "during a good part of the deployment."

These arguments address factual, rather than legal sufficiency. The inferences in favor of the government we are required to draw under a legal sufficiency analysis are such that the testimony and evidence presented, in the context of the entire trial, meet the requirement that a factfinder could rationally have found all of the essential elements of the offenses beyond a reasonable doubt. As such, the charged offenses were legally sufficient. We will therefore evaluate the evidence in light of appellant's arguments for factual sufficiency and whether we ourselves are convinced of appellant's guilt beyond a reasonable doubt.

## 2. *Factual Sufficiency*

Appellant makes several salient arguments regarding the quality of the government's evidence. For the most part, the witnesses at trial were a group of drug users, liars, and murderers. In reviewing the factual sufficiency of the evidence, we must therefore consider what evidence we believe, even if presented through the testimony of admitted criminals. When credibility is an issue, direct and circumstantial evidence is even more important. After reviewing the entire record of trial we conclude that appellant was similarly a liar and murderer. Thus, although a number of the witnesses against appellant had both a motive to fabricate and the opportunity to collude against appellant, we find their testimony generally to be credible on the key facts for the charged offenses. Moreover, appellant's own admissions, use of the AK-47 retrieved from the ANP IED site as a drop weapon after killing an unarmed Afghan, and the implausibility of much of appellant's own testimony combined with the other compelling physical and circumstantial evidence is such that we are ourselves convinced of appellant's guilt beyond a reasonable doubt for all of the offenses.

### *a. Witnesses' Bias Against Appellant*

Appellant asserts the witnesses were biased against him. However, prior to appellant getting them involved in "scenarios" to kill unarmed Afghans and assaulting and threatening to kill a member of the platoon, the members of the unit had a high opinion of appellant, liked him, trusted him, and thought "he was the best squad leader they ever had." The junior soldiers trusted appellant and respected his physical fitness and experience from prior deployments. For similar reasons, the NCOs also respected and trusted appellant when he joined the platoon. Staff Sergeant Sprague had previously served with appellant. Similarly, SSG Stevens knew appellant for several years before the deployment to Afghanistan, liked him, and considered him to be a close friend. In SSG Stevens' opinion, while they were previously assigned together in 2008, every soldier "loved [appellant]" and appellant was the most popular soldier in the company.

Appellant is correct that the other co-conspirators now resent him, primarily for getting them involved in serious criminal offenses. As their squad leader, they

wanted appellant to share in full responsibility for the conspiracy that he initiated and the offenses he committed. However, this anger is much different than fabricating allegations against appellant. The co-accuseds got involved in the conspiracy because they trusted and respected appellant. They thought he was competent and credible enough for them literally to get away with murder.

### b. Motives to Fabricate and Collusion

Appellant contends that CPL Morlock was the true mastermind behind any alleged offenses and CPL Morlock colluded with the other witnesses to frame appellant. Essentially, according to appellant, the criminals that testified had a motive to fabricate appellant's involvement in order to minimize their own culpability.

Indeed, many of the witnesses provided self-serving testimony, minimizing their roles in the most serious offenses. For example, CPL Morlock testified he only shot in the general direction and did not know whether he hit the Afghan at either Kari Kheyl or Qualaday, despite being an expert marksman and being respectively only ten and twenty feet away from each of the individuals at whom he fired his weapon. Similarly, SPC Winfield testified that he did not shoot at the Afghan at Qualaday, but instead shot high over the Afghan's head.[6] Specialist Kelly was not credible when he testified that he just automatically covered the grenade spoon with dirt after the first murder and did not give his actions any thought. However, these minimizations are a far cry from fabricating the allegations against appellant.

Corporal Morlock was very detailed and generally credible through hundreds of pages of testimony and cross-examination. Further, his alleged motive to fabricate was undermined by his own admissions to the crimes. For example, according to appellant, CPL Morlock was not even at Kari Kheyl during what appellant characterized as a lawful engagement involving the AK-47. If this were actually the case, it would mean CPL Morlock confessed to a murder he did not commit. This would have been an opportunity for CPL Morlock to credibly distance himself from the shooting, yet, CPL Morlock admitted to participating in this murder.

Appellant further points to the opportunity for collusion against him by witnesses coordinating and discussing the contents of their statements at the very

---

[6] If SPC Winfield fired high with his Squad Automatic Weapon, as claimed, then it was in the direction of his platoon with only a mud wall in between. There was no testimony that any member of the platoon received any indirect fire during this incident.

beginning stages of the investigation. Inexplicably, after the investigation began, members of the platoon were transported to KAF and housed together. Although ordered not to discuss their testimony, CPL Morlock, CPL Quintal, and SPC Winfield felt comfortable enough to drive around KAF and smoke hashish together. Specialist Winfield testified that during these drives, they may have spoke "a little bit" about what they told CID. Given their relationship, we find it unlikely they only spoke "a little bit." The record establishes that these witnesses were trying to minimize their own and their friends' involvement in the crimes. For example, CPL Morlock testified that he originally tried to protect SSG Bram, PFC LeCroy, and PFC Holmes from investigation into their crimes. Other co-conspirators initially denied any actual involvement or knowledge in the murders. Indeed, at the start of the investigation, the co-accuseds discussed not saying anything to CID. Similarly, appellant told SPC Winfield to lie to CID and keep his mouth shut.

However, from the very start of their admissions to CID, members of the unit discussed appellant being involved in planning the "scenarios" and murders. The co-conspirators' testimony was supported by independent evidence in the record. Poignantly, this included SPC Winfield's messages in February to his parents. These messages occurred prior to any potential collusion taking place and provided a snap-shot of appellant's knowledge of the first murder, continued involvement in the conspiracy to kill unarmed Afghans, possession of the AK-47 as a drop weapon to stage another murder, and later threats against SPC Winfield if he exposed appellant's crimes. There was also credible incriminating testimony from SSG Stevens who was a long-time friend of appellant, was not part of appellant's unit, and was not considered a suspect until later in the investigation. The record of trial also established appellant's guilt independently and prior to any potential co-conspirator's motive to fabricate to CID.

### c. Appellant's Testimony was Not Credible

As this court has previously recognized an accused who testifies "does so at his own peril." *See United States v. Pleasant*, 71 M.J. 709, 712-13 (Army Ct. Crim. App. 2012). "[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *Id.* (quoting *United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004) (further quotations and citations omitted)). Here, the military panel disbelieved appellant's testimony. Similarly, in our independent assessment of the record, we also find appellant's testimony was not credible. The trial was not just a credibility battle between two conflicting camps of testimony about what actually happened during the platoon's ill-fated deployment. There was also compelling physical and circumstantial evidence presented at trial that supports the guilty findings.

For example, appellant's explanation for gathering grenades, weapons, and explosives is completely unbelievable. According to appellant, he did not obtain

grenades "off-the-books."  Appellant testified that grenades were used all the time and were not an accountable item.  They were often used to collapse wells, caves, or other hard to reach areas that might contain enemy weapon caches.  However, appellant's platoon leader contradicted this testimony confirming that grenades were a reportable and accountable item.  Appellant further obtained grenades outside of the unit supply system, specifically testifying he went to another unit on the FOB in order to get resupplied with a partial crate of grenades.  Appellant also supplied SSG Stevens with a grenade outside the unit supply system.  These were unaccounted for grenades.  According to other witnesses even appellant referred to the grenades as "off-the-books."

Even more incredible, at the time the conspiracy was exposed, appellant was in possession of multiple weapons and explosives that could be used as "drop weapons."  Appellant explained he obtained the cracked Claymore mine from another unit that was leaving the area of operations and intended to blow it up in a hole, similar to how the unit used grenades.  He also stated he intended to blow up the 81mm mortar to make a larger explosion when they destroyed the defective Claymore mine.  According to appellant, he obtained the RPG from the ANA to conduct a live-fire with his unit.

If appellant intended to lawfully use the gathered contraband, it would not have been stored around living areas.  Similarly, an experienced infantry soldier and NCO would not have obtained and stored an unsafe, cracked-in-half, duct-taped Claymore mine inside his Stryker vehicle for legitimate purposes.  If intended for legitimate purposes, the weapons and explosives would have been properly accounted for and stored in a safe area.

Appellant also admitted to assaulting PFC JS with other soldiers in the platoon because he was angry that PFC JS falsely reported that everyone in the platoon was using drugs.  According to appellant, he did not know soldiers were smoking hashish.  Appellant thought PFC JS was a coward and was mad PFC JS accused him of drug use.  Appellant admitted to showing PFC JS severed fingers to "scare him" and to persuade him to not report the assault.  However, appellant's actions and threats were more consistent with someone that was trying to impede investigation of much more serious offenses.

These are just some examples of appellant's implausible and incredulous testimony.

### d.  The Timing of Appellant's Arrival and the Increase in Engagements

Before appellant arrived at FOB Ramrod the platoon had only been involved in one combat engagement.  Yet within approximately five months of appellant arriving, the platoon had four engagements.  Each of the Afghans killed in the

engagements after appellant's arrival was searched. The only weapons or ammunition found on them were the respective drop-weapons. Additionally, no other weapons or ammunition were found in the area around any of the engagements. Furthermore, the grenade attack at Qualaday occurred in close proximity to a woman and children. In retrospect, the overall "scenario" involving an elderly Afghan male holding two grenades, removing the pin, and blowing apart his own legs while attacking is completely unbelievable. At the time, since the unit was engaged in combat operations and the Army trusts soldiers not to murder noncombatants, the platoon's engagements were not questioned or suspected of being crimes. In hindsight, after the conspiracy was revealed, these "scenarios" were clearly staged.

*e. Factual Sufficiency of Specification 1 of Charge I, Conspiracy to Commit Premeditated Murder, and Specification 1 of Charge II, Premediated Murder in January at La Muhammad Kalay*

Appellant contends CPL Morlock and SPC Winfield provided the only testimony to support any conspiracy to commit premediated murder as it pertains to appellant. He further contends CPL Morlock was the only witness to appellant's averred participation of providing an off-the-books grenade for the incident at La Muhammad Kalay in January where CPL Morlock threw a grenade and PFC Holmes shot an unarmed Afghan. He asserts SGT Jones and appellant, the only other witnesses to testify about the alleged preplanning of this incident by using an off-the-books grenade, flatly denied any conspiracy.[7]

---

[7] Further, appellant notes this court only found CPL Morlock guilty of attempted murder for his actions at La Muhamad Kalay based on his providence inquiry into his plea to premeditated murder. *United States v. Morlock*, ARMY 20110230, 2014 CCA LEXIS 280 (Army Crim. Ct. App. 30 April 2014) (mem. op.), *rev. denied,* 74 M.J. 80 (C.A.A.F. 2014). This court found that the military judge should have resolved inconsistencies between CPL Morlock's guilty plea to premeditated murder as a principal versus as an aider and abettor. However, we are constrained in our Article 66(c), UCMJ, review by the facts and evidence presented in this record, rather than CPL Morlock's providence inquiry at his guilty plea.

In appellant's trial CPL Morlock testified, "After the explosion, sir, I stood up at my position there by the wall and the individual appeared to be dead, sir, yes. " He further confirmed that when another soldier fired at the body afterward the Afghan did not react, move, or do anything. Furthermore, in appellant's trial, SPC Christy, a medic, testified that he arrived at the scene shortly after the explosion and the Afghan was lying face down in blood and was dead.

(continued . . .)

We are convinced beyond a reasonable doubt that appellant was a part of a conspiracy with other members of Bravo Company that existed between 1 November 2009 and 11 May 2010 with the object of that conspiracy being the premeditated murder of Afghan noncombatants. While appellant asserts the only evidence of appellant's participation in planning the La Muhammad Kalay incident in January 2010 was CPL Morlock's testimony, SPC Winfield, SPC Christy, and CPL Quintal each corroborated CPL Morlock's testimony.

Specialist Winfield testified that in December, 2009 CPL Morlock informed him that "[appellant] had been telling [CPL Morlock] how to do it and when [CPL Morlock] finally got the grenade [CPL Morlock] kept talking about it more and more." This testimony was bolstered by the Facebook messages SPC Winfield sent his family in February, 2010, in the midst of the on-going conspiracy, which specifically referenced "[his] squad leader…giv[ing] high fives to the guy who kills innocent people and plans more with him." Appellant was SPC Winfield's squad leader.

Additionally, CPL Quintal and SPC Christy also corroborated CPL Morlock's testimony, testifying respectively that in December, 2009 and January, 2010, CPL Morlock told each of them appellant had given CPL Morlock the off-the-books grenade and how to get away with murder. We are ourselves convinced beyond a reasonable doubt that appellant was a part of the conspiracy to commit premeditated murder against Afghan noncombatants. We are also convinced appellant's participation in the conspiracy occurred prior to CPL Morlock and PFC Holmes murdering an Afghan noncombatant at La Muhammad Kalay. Appellant is therefore criminally liable for their actions.

### f. Factual Sufficiency of Specification 2 of Charge II, Premeditated Murder at Kari Kheyl and the AK-47 Drop Weapon

Appellant contends the only issue in dispute for the killing at Kari Kheyl was whether appellant acted in self-defense within the law of armed conflict or committed premeditated murder as charged. We are convinced beyond a reasonable doubt that the Afghan did not shoot at appellant with an AK-47, but rather appellant planted the weapon next to the unarmed Afghan after murdering him.

At trial, appellant denied any conspiracy to murder unarmed Afghan civilians. According to appellant, he shot the Afghan male at Kari Kheyl in self-defense.

---

(. . . continued)
Based on the record before us, we are ourselves convinced beyond a reasonable doubt that the actions of CPL Morlock and PFC Holmes caused the Afghan's death.

Appellant entered a compound previously identified as belonging to a "Taliban Commander." While in the compound, appellant heard shots fired at him, turned, and saw an Afghan holding an AK-47 that had "malfunctioned." Appellant shot the Afghan. At the same time, SPC Wagnon ran into the compound, pushed appellant behind cover, and also shot the Afghan. Appellant denied planting an AK-47 after the shooting. He stated he returned the AK-47 he found during the IED strike to the ANP. He also testified CPL Morlock was not even at the compound at the time of the Kari Kheyl shooting.

We do not find appellant's testimony that the shooting was a lawful engagement to be credible. Appellant was an experienced infantry NCO with prior deployments to Iraq and Afghanistan and prior combat engagements. Even though his unit became complacent, his explanations for his actions were contrary to what we would expect of an experienced infantry soldier and NCO. Appellant testified that he went inside a "Taliban commander" compound alone, without clearing around the corner, and with his weapon hooked on a D-ring and not at a ready position. Appellant's explanation of how he entered the compound is contrary to what would be expected of an experienced infantry soldier and NCO.

Further, contrary to appellant's self-defense story that the Afghan's weapon "jammed" or "malfunctioned," allowing appellant to return fire, SSG Sprague testified the AK-47 did not have a round in the chamber and functioned properly when he test fired it. Appellant, specifically tried to dissuade SSG Sprague from using the weapon. Staff Sergeant Sprague testified that it would be unusual to have an empty chamber if the weapon actually had malfunctioned or jammed.

Appellant further takes issue with CPL Morlock's testimony that the AK-47 was the same weapon appellant had obtained earlier from the ANP IED incident. Appellant asserted he returned the AK-47 from the ANP IED incident to the ANP and that it, therefore, could not have been used as a drop-weapon. However, aside from appellant's testimony, there was no evidence that appellant gave an AK-47 to the ANP. In fact, the testimony presented established that appellant took the AK-47 from the IED site, multiple witnesses testified to seeing the AK-47 in and around the Stryker, and several witnesses testified that appellant was in possession of the AK-47. Additionally, SSG Stevens testified that appellant himself told SSG Stevens that appellant obtained the AK-47 from the ANP IED site and used the weapon to stage the killing of an Afghan.

This testimony and the other evidence presented at trial establishes that appellant retained the AK-47 after the ANP IED attack and used the same weapon to kill the Afghan male at Kari Kheyl. The description of the weapon taken from the ANP IED site and the weapon lying next to the body at Kari Kheyl affirmed both weapons were composed of the same black material and had a folding stock. While the weapon recovered next to the body was missing the front handgrip, sling, and

suppressor, CPL Quintal explained that he removed the forward grip and leather sling from the weapon when it was stored in the Stryker and CPL Morlock explained he and appellant had removed the suppressor in order to fit the weapon into appellant's assault pack. The descriptions of the weapons were the same because it was the same weapon.

Appellant also contends that on the day of the Kari Kheyl shooting he was carrying a "Land Warrior"[8] in his assault pack and that the system is clearly visible in a photograph taken that day. According to appellant, this would have precluded the AK-47 from being carried in appellant's pack as CPL Morlock claimed. However, both SSG Sprague and SPC Corey Moore testified appellant's assault pack appeared empty after the shooting. This was also consistent with appellant's testimony that he would normally leave the Land Warrior in his Stryker and did not typically take it on patrols because it was "big and bulky" and essentially "worthless." Appellant also testified that individuals in the field often would strap the Land Warrior to their kits without the pieces being hooked up to the main unit. Although the eye-piece and controls are visible in the photograph taken at Kari Kheyl, the main unit is not. Consistent with appellant's own description, we find that appellant had the eye-piece and controls attached to his helmet and kit without the controls being hooked up to the main unit of the Land Warrior system. It was not hooked up because appellant's assault pack was in fact empty the day of the Kari Kheyl shooting as both SSG Sprague and SPC Moore testified.

CPL Morlock's testimony was also bolstered by appellant's friend, SSG Stevens, who testified appellant admitted staging the killing of an Afghan by planting an AK-47. Appellant then told SSG Stevens to "take this" information to his "grave." Further, directly contradicting appellant's testimony and supporting CPL Morlock's version of events, PFC Willis testified he saw CPL Morlock with SPC Wagnon at the entryway to the alley and CPL Morlock fired a couple rounds. Lastly, SPC Winfield's Facebook message to his parents on Valentine's Day 2014 specifically referenced the potential future use of an AK-47: "well if you talk to anyone on my behalf i have proof that they are planning another one in the form of an ak47 they want to drop on a guy[.]" Combined with the other testimony and drop weapons and explosives discovered by EOD and CID, we are ourselves convinced beyond a reasonable doubt that appellant committed premeditated murder by shooting the Afghan at Kari Kheyl.

---

[8] A Land Warrior is a piece of equipment that tracks the location of members of a platoon and also allows for radio communication. It was described as similar to other Blue Force trackers, but for use at the small unit level.

### g. Factual Sufficiency of Specification 3 of Charge I, Conspiracy to Commit Aggravated Assault, and Specification 2 of Charge IV, Aggravated Assault, by Shooting at Unarmed Afghan Farmers

Appellant contends the only evidence relevant to the conspiracy to commit aggravated assault and aggravated assault charges was the testimony of SSG Stevens, SGT Jones, and appellant. Staff Sergeant Stevens testified the squad unlawfully fired on Afghan farmers. Both appellant and SGT Jones testified the shooting was a lawful engagement. We are convinced beyond a reasonable doubt the Afghan males did not engage in a hostile act and did not display any hostile intent before being unlawfully fired upon.

Staff Sergeant Stevens testified appellant discussed getting SSG Stevens a "kill" before the patrol tried to lure the Afghan farmers to its location, and specifically discussed with him killing the two farmers with the same duct-taped Claymore mine later recovered by CID. It was a clear day with "outstanding" visibility. The farmers were only around 100-200 meters away and the squad observed them for approximately five minutes. At this distance, SSG Stevens could see that one of the farmer's had a shovel over his shoulders. The farmers never engaged in a hostile act or displayed any hostile intent. Appellant called out that one of the farmers had an RPG and another individual on the line sarcastically responded "Yeah, I see that -- I see it also." Appellant then gave the order to fire counting down, "One, two, three, fire." Staff Sergeant Stevens testified that he, appellant, SGT Jones, SPC Wagnon, and PFC Moore all opened fire in the direction of the farmers. After the squad stopped firing appellant then told them that if they had killed the farmers "the story would be that there was a third guy that got away with an RPG . . ."

Appellant on the other hand testified the squad lawfully engaged the Afghans because he positively identified one of them was carrying an RPG. While appellant admitted he used colorful language when he invited SSG Stevens to come on a 3rd platoon mission, he claimed "come with us you'll get the fucking kills," did not mean killing unarmed civilians. Appellant testified while on dismounted patrol they set up security in a grape field when he received a radio transmission from the platoon leader during the mission stating there was SIGINT that a male with an RPG was in the area and was about to attack.[9] After receiving the radio transmission, the squad observed three Afghan males in the field. Someone yelled that one of the males had a radio antenna. Appellant testified he stood up on a berm to observe the

---

[9] In rebuttal, the platoon leader during this mission (not the same platoon leader involved in mutilating an Afghan body) credibly testified he did not transmit to appellant there was a threat of an imminent attack or "an RPG team" in the area.

three Afghans more closely and yelled in Pashto for them to come towards his squad. However, they ran away. Appellant saw one of the Afghans carrying an RPG, appellant then dropped down and fired at them. Others in the squad fired as well.

Sergeant Jones testified for the defense and denied any conspiracy to kill innocent Afghans. Sergeant Jones testified that the night prior to the dismounted patrol where they confronted the farmers, the unit was briefed that the area was "very hostile." Sergeant Jones stated he did not see anyone with an RPG, did not see anyone with a radio, did not fire his weapon, and did not see appellant stand on a berm. Essentially, he claimed he was cross-loading equipment with SPC Wagnon facing away from the farmers. Sergeant Jones testified he, nevertheless, believed the male Afghans in the field were a "threat."

In addition to the testimony of these three individuals, both SGT Hefner and SPC Winfield provided limited testimony regarding the engagement. Both SGT Hefner and SPC Winfield were to the left flank of the rest of the squad and asserted at trial they were not involved in the shooting itself. Sergeant Hefner never saw the farmers at all. However, just prior to the shooting he heard someone yell, "RPG" and then count-off "one, two, three, fire." Similarly, SPC Winfield heard appellant state, "Hey, those guys have an RPG." He had seen individuals in a field who "were just farming" and assumed appellant was talking about them. He then overheard some discussion from the squad and "then there was a count down and then they started firing." He believed the statements were made by appellant.

We find appellant's and SGT Jones's version of events to be incredible. According to appellant, despite having received a radio transmission informing him of an imminent RPG attack, he nonetheless stood on top of a berm to observe the Afghans in the field. According to appellant, this was also after someone in the squad yelled out that one of the Afghans had a radio antenna.[10] Appellant's actions were entirely inconsistent with those of an NCO with his combat experience and would have silhouetted him to allegedly hostile Afghans with an RPG. Furthermore, SGT Jones' testimony was entirely self-serving, claiming he saw absolutely nothing and denied essentially everything. This included not even seeing appellant stand on the berm. Despite having allegedly seen nothing, to include never having seen the farmers engage in any hostile act or display any hostile intent, he amazingly still testified they were a threat.

---

[10] Appellant himself testified that individuals with radios were seen as such a threat in the area that the unit tried to change the rules of engagement to allow engaging individuals with radios.

On the other hand, both SGT Hefner and SPC Winfield corroborated SSG Stevens' testimony that appellant counted down before giving an order to fire. An experienced infantry soldier and NCO would have ordered soldiers to immediately fire upon a hostile threat from an RPG instead of counting down "one, two, three" before ordering them to fire. We are convinced beyond a reasonable doubt it was clear to appellant and the soldiers in line that the Afghans did not have an RPG or any other weapon when they collectively agreed, counted down, and did fire upon the farmers. Likewise, we are ourselves convinced beyond a reasonable doubt that appellant was a part of the conspiracy to commit aggravated assault and committed aggravated assault by shooting at these Afghan noncombatants.

### h. Factual Sufficiency of Specification 3 of Charge II, Premeditated Murder at Qualaday

Appellant asserts the only evidence to support the charge of premeditated murder of the elderly Afghan at Qualaday is the testimony of CPL Morlock and SPC Winfield. He claims while the testimony of each corroborated the other, the overwhelming weight of the evidence, by multiple objective witnesses, showed appellant was not involved in the killing at all. We, however, are convinced beyond a reasonable doubt that appellant threw a grenade at the elderly Afghan, CPL Morlock and SPC Winfield shot him, and the scene was then staged with the Russian pineapple grenade to cover up their premeditated murder. Lastly, appellant then walked over to the Afghan and shot him twice in the head.

Corporal Morlock testified that, prior to leaving the FOB, appellant talked with him about bringing and looking for an opportunity to use the Russian grenade in a scenario. Both he and SPC Winfield testified that while in the village the two of them entered a smaller compound and encountered an elderly Afghan with what appeared to be his family. Appellant arrived with other members of the unit. CPL Morlock testified that SGT Jones and SPC Rodriguez continued northeast leaving himself, appellant, SPC Winfield and SPC Corey Moore with the Afghan. They then planned that appellant would throw a grenade, SPC Winfield and CPL Morlock would shoot the Afghan, and SPC Moore would essentially act as a lookout. Lastly, after the engagement CPL Morlock would plant the Russian pineapple grenade next to the body. Specialist Winfield's testimony corroborated this plan except he testified both SGT Jones and SPC Rodriguez were also a part of the discussion. They then implemented the plan. Appellant threw a grenade. The grenade went off and SPC Winfield and CPL Morlock shot at the Afghan. CPL Morlock then planted the pineapple grenade next to the Afghan's body. Both CPL Morlock and SPC Winfield testified that when CPL Morlock put the grenade next to the body appellant walked up to the Afghan and shot him point blank two times in the head.

In contrast, appellant testified he was not involved in the engagement at all. According to appellant, the squad was in a larger compound when SPC Winfield and

CPL Morlock left on their own. Appellant, SGT Jones and SPC Rodriguez then began a protracted search to try and find CPL Morlock and SPC Winfield in a maze of different rooms, to include searching the roof. Eventually, appellant allegedly found the two and chastised them, assigning them to the rear of the element. Specialist Rodriguez and SGT Jones were in the front and appellant was in the middle. After continuing the patrol away from the compound for another thirty to forty seconds appellant heard gunfire. Appellant testified that he specifically recalled saying something to SPC Rodriguez or maybe SGT Jones and remembers being midsentence when the shots or explosions occurred. He then turned around and saw CPL Morlock and SPC Winfield laying on the ground firing into a cloud of dust. Appellant testified that he then attempted to make a radio call, but CPL Morlock was already on a radio screaming "we're in contact." As soon as CPL Morlock finished transmitting, appellant used his radio to call the platoon sergeant. Appellant had no memory of SPC Moore being there, but stated he could have been.

SPC Rodriguez and Sergeant Jones each testified for the defense that there was never a meeting to discuss killing an Afghan male. Specialist Rodriguez testified that he, appellant, and SGT Jones were having a conversation when they heard the gunfire. However, SGT Jones testified that while he could see appellant when the engagement occurred, appellant was too far away to have a conversation. He admitted appellant was not in mid-sentence talking with him because of this distance. Sergeant Jones also confirmed that SPC Moore was on the patrol and was close to appellant when the engagement occurred. Specialist Moore testified he was on the patrol but denied being a part of a conspiracy to kill anyone. He also testified that after the engagement he saw appellant "index" or "double tap" the Afghan, but could be mixing it up with the La Muhammad Kalay incident.

Admittedly the testimony of SGT Jones, SPC Rodriguez, and SPC Moore contained favorable aspects for the defense. However, we find CPL Morlock's and SPC Winfield's testimony about the murder more credible. Furthermore, in contrast, appellant's story is implausible. We find it incredible that appellant would not remember SPC Moore's presence on the patrol at the time of the encounter, especially in light of SGT Jones's testimony indicating SPC Moore was the closest individual to appellant. Sergeant Jones's and SPC Rodriguez's testimony also contradicted each other regarding whether appellant was engaged in conversation with them. According to SGT Jones, he could not have been talking to appellant because appellant was too far away. Lastly, appellant's presence was corroborated by PFC Willis who saw appellant, CPL Morlock, SPC Winfield, and SPC Corey Moore leave part of the compound to clear the other side just before hearing the explosion and gunfire.

Appellant also went to great lengths to describe the protracted search for CPL Morlock and SPC Winfield that occurred before the engagement. This story of going here and there in order to find the two, complete with introspective remarks on

where they could possibly be, is ridiculous in light of appellant's later testimony. According to appellant, both he and CPL Morlock had radios that each of them separately used to call in the engagement. Appellant's circuitous attempts earlier to find the two was clearly fabricated given that he and CPL Morlock each had radios. However, appellant did not need to find them because they were already together conspiring to and committing premeditated murder.

Lastly, a photograph introduced at trial corroborates the testimony of CPL Morlock, SPC Winfield, and SPC Moore that they witnessed appellant shoot the Afghan twice in the head. This photograph depicts the Afghan's head and shows a fairly large wound in the back of the head behind the right ear. We are ourselves convinced beyond a reasonable doubt that appellant conspired to and did commit premeditated murder of an unarmed Afghan at Qualaday.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of appellant's guilt with respect to all of the specifications and charges of which he was found guilty. Appellant had the means, motive, and opportunity to conspire and kill unarmed Afghan civilians. Sadly, appellant was the catalyst and driving force of these crimes.

### B. Allegations of Post-Trial Error

Like the trial, the post-trial procedures involved in appellant's case were long and complicated. Appellant assigned two separate errors regarding the post-trial processing of his case: 1) the convening authority abused his discretion by failing to grant a post-trial Article 39(a) session based on the information defense then had regarding testimony both SSG Bram and SPC Wagnon would have provided had they been granted immunity and testified at appellant's court-martial; and 2) the government committed a post-trial *Brady* violation by failing to disclose the contents of post-trial interviews with SSG Bram.

We ordered a *DuBay* hearing to find facts and resolve factual disputes regarding these issues. After reviewing the *DuBay* hearing and the findings of the *DuBay* judge, we determine the convening authority did not abuse his discretion and there was no post-trial *Brady* violation. Further, we also determine appellant's requested relief did not constitute a request for a new trial. In the alternative, to the extent appellant's assignment of errors could be considered such a request, appellant has not met his burden under R.C.M. 1210.

23

*1. Background Facts Based on Both the Post-Trial Processing of Appellant's Case and the DuBay Hearing*

As detailed in our legal and factual sufficiency analysis, there were a number of co-accuseds and disciplinary matters that arose from the criminal activities on the platoon's deployment. Cases against members of the platoon included court-martial proceedings against CPL Morlock, SPC Winfield, SSG Stevens, CPL Quintal, PFC Holmes, SPC Wagnon, SSG Bram, SGT Jones, SPC Kelly, SPC Corey Moore, and appellant.

The government's strategy in timing the courts-martial was to complete a trial and then grant immunity to the convicted soldier. This allowed the government to order the newly convicted soldier to cooperate and testify in the remaining trials without raising *Kastigar* issues.[11] The prosecution team planned to proceed to trial on the less culpable accuseds first. They then planned to recommend the CA grant testimonial immunity to a newly convicted soldier and order him to testify against a more culpable accused.

In the government's assessment, appellant was the most culpable. As such, they originally planned to conduct his trial last. For SSG Bram's charges, the government had planned to conduct his trial before appellant's trial. However, due to litigation delays, SSG Bram's contested trial was not completed until about a week after appellant's November 2011 trial. After SSG Bram's trial was complete, the government immunized SSG Bram and intended for him to also testify against SPC Wagnon. With respect to SPC Wagnon, as the cases proceeded the government determined the evidence against SPC Wagnon was the weakest, forcing the government to delay the date of SPC Wagnon's trial until after appellant's case completed. The government intended to immunize appellant and order him to testify against SPC Wagnon.

The government made it clear to the defense counsel involved in the various cases, to include appellant's counsel, that the staff judge advocate (SJA) would not recommend the CA grant testimonial immunity for any given witness until completion of that witness' own court-martial or administrative proceedings. Although not required by any particular rule, the Office of the Staff Judge Advocate

---

[11] *Kastigar v. United States,* 406 U.S. 441 (1972), held the government can compel a witness who invokes the Fifth Amendment privilege against self-incrimination by conferring immunity. However, in any subsequent prosecution of such an immunized witness, the prosecution affirmatively bears the burden to show that proposed evidence is derived from legitimate independent sources from the compelled testimony. *Id.* at 461-62.

(OSJA) required that all requests for immunity be submitted in writing for these cases. The OSJA further required all requests for immunity be processed through the Chief of Justice and the SJA for action by the CA. Individual prosecutors did not have the discretion to wait on or disregard formal immunity requests. Overall, the CA granted testimonial immunity and issued orders to testify for twenty-three soldiers.[12]

At the time of appellant's trial, SPC Wagnon and SSG Bram both had indicated through counsel an intent to invoke their Fifth Amendment privilege against self-incrimination if called to testify. Their own trials had not been completed and they had not been granted testimonial immunity. Appellant's counsel never submitted a written request for immunity for these two individuals to testify at appellant's trial.[13] Yet, SPC Wagnon and SSG Bram were both listed on the defense witness list for appellant's trial. SPC Wagnon was at the courthouse during appellant's trial dressed in his Class A or Army Service Uniform. This gave the appearance SPC Wagnon was going to testify for appellant without a grant of immunity. Appellant's trial concluded on 10 November 2011. Neither SSG Bram nor SPC Wagnon was called by either party as a witness. After appellant's trial, the government continued with court-martial proceedings against the two.

On 18 November 2011, SSG Bram was convicted of a number of offenses to include conspiracy to commit assault, obstruction of justice, wrongfully soliciting CPL Quintal to murder Afghan noncombatants, and dereliction of duty for willfully failing to properly account for and dispose of an AK-47. The government then immunized SSG Bram and conducted a post-trial interview. In this interview with the government, SSG Bram discussed issues that were contrary to the trial testimony

---

[12] This included granting appellant immunity and issuing him an order to testify after his own trial.

[13] This fact was highly contested at the *DuBay* hearing. Both the prosecution and trial defense teams contradicted each other regarding whether a formal written immunity request was ever submitted. After considering testimony and numerous exhibits for purposes of his *DuBay* findings, to include a "Consent Motion to Continue" dated 25 February 20[11] signed by trial counsel and containing the statement "The defense has requested of the GCMCA that immunity be granted for all of these witnesses and asked that depositions be ordered; however, that request is still pending[,]" the *DuBay* judge assessed the credibility of all witnesses and found the greater weight of evidence supported a finding that "Appellant's original trial defense team did not make a written request for immunity for either SPC Wagnon or SSG Bram prior to the Appellant's trial." In light of all of the evidence presented we similarly find no written request for immunity was made.

of CPL Morlock, SPC Quintal, and SPC Winfield. SSG Bram's attorney later discussed the interview with appellant's counsel. Based on this information, appellant's counsel proffered that if SSG Bram had been called to testify, "he would say he never saw an AK-47 that was picked up from the . . . IED incident, he never engaged in an exchange of an AK-47 with Gibbs, and had no idea about an AK-47 being used in illegal conduct." The government did not disclose the content of the interview to appellant until after appellant submitted clemency matters averring a post-trial *Brady* violation.

After the government conducted the interview with SSG Bram, the convening authority dismissed charges against SPC Wagnon and administratively discharged him in lieu of court-martial, under Chapter 10, Army Regulation 635-200. In December 2012, after he was discharged and no longer subject to court-martial jurisdiction, appellant's counsel interviewed SPC Wagnon. SPC Wagnon provided a sworn statement to appellant's counsel in which he denied committing any unlawful acts, specifically denied any conspiracy to murder Afghans existed, and asserted appellant's use of force on 22 February 2010 to shoot and kill the Afghan male at Kari Kheyl was justified in self-defense.[14] The letter also stated that SPC Wagnon reviewed CPL Morlock's statement about the shooting at Kari Kheyl and asserted CPL Morlock was a liar.

After the court-martial record was authenticated and prior to initial action by the CA, appellant's defense counsel made multiple requests for a post-trial hearing to address this potentially exculpatory evidence from SPC Wagnon and SSG Bram. According to appellant's defense counsel, they made immunity requests before trial, but asserted these requests were denied by the government. The SJA completed three addendums to the staff judge advocate recommendation (SJAR) and appellant's counsel submitted two supplemental R.C.M. 1105 clemency requests in rebuttal to these addendums.

Among a number of other disputes, the parties disagreed about the following: (1) whether appellant requested the CA grant immunity for SPC Wagnon and SSG Bram to testify at appellant's trial (2) whether the timing and order of the CA grants of immunity to other co-accuseds was improper during the multiple courts-martial arising from the platoon's deployment to Afghanistan (3) whether SPC Wagnon's and SSG Bram's anticipated testimony was new and exculpatory evidence that substantially effected the legal sufficiency of the findings of guilty and sentence at appellant's trial and (4) whether the CA was required to direct a post-trial hearing to consider SPC Wagnon's and SSG Bram's testimony.

---

[14] The sworn statement was not technically a sworn affidavit. However, SPC Wagnon signed the statement and swore the information in the statement was true.

The SJA disagreed with appellant's allegations of error. The SJA stated that the government had the authority to order trials of co-accused in a manner beneficial to its case and will often wait to the completion of an accused's trial before attempting to gain cooperation in subsequent trials. According to the SJA, the statement made by SPC Wagnon was "self-serving" and made after SPC Wagnon had the benefit of observing witnesses and the information from the previous trials of co-conspirators.

The SJA acknowledged that SSG Bram was interviewed by the government after his own court-martial. The SJA attached an affidavit from the trial counsel (TC) summarizing SSG Bram's interview. According to the SJA, SSG Bram did not reveal exculpatory information related to appellant and there was no *Brady* violation. The SJA summarized the information from the affidavit:

> PVT Bram acknowledged his possession of the AK-47 and indicated several others knew of the location of the weapon. While PVT Bram disputed PVT Winfield's recollection of how the squad came into possession of the weapon, there is no dispute that PVT Bram admitted having the weapon. PVT Bram further admitted that it was widely known that the weapon was located in his vehicle and the weapon was intended for unlawful use against Afghan civilians.

Based on the evidence presented at trial, the SJA recommended that the CA not order a post-trial session. Appellant disagreed with the SJA's conclusions and recommendations. According to appellant, the government purposefully planned the timing of SPC Wagnon and SSG Bram's trials to preclude them from testifying for appellant. Appellant pointed out that SPC Wagnon was not available to the defense before trial because he was represented by counsel. Appellant's counsel stated that they asked for SPC Wagnon to be immunized and the request was denied. Appellant disputed the content of the TC affidavit of SSG Bram's interview. Appellant stated that all of the TC's notes from the interview should have been turned over and demanded that the notes from SSG Bram's interview be given to appellant's defense team.

On 26 November 2013, the CA approved initial action in appellant's case. The CA did not complete a separate document denying appellant's request for a post-trial session. However, by approving the initial action, the CA by implication denied appellant's request for a post-trial session.

We ordered a *DuBay* hearing, among other reasons, to determine the testimony of both SPC Wagnon and SSG Bram.[15]

At the *DuBay* hearing, SPC Wagnon testified about the circumstances at Kari Kheyl, corroborating the details of appellant's testimony that the shooting was a lawful engagement. According to SPC Wagnon, the Afghan male had a weapon. He testified CPL Morlock only arrived after the shooting. Specialist Wagnon denied having any discussions with appellant or CPL Morlock about killing anyone or using an AK-47 as a drop weapon. He asserted he never saw an AK-47 at the unit before the shooting. In SPC Wagnon's opinion, CPL Morlock was "cocky and arrogant and wanted to be the cool guy and would say or do anything to fit in." Lastly he stated that while in confinement at Fort Lewis, SPC Winfield stated that when SPC Winfield was in Kandahar he overheard CPL Quintal, PFC JS, and CPL Morlock say they would "pin everything" on appellant to help themselves.

At the *DuBay* hearing, SSG Bram testified that while he was aware and had seen a contraband AK-47 in his Stryker for use as a potential drop weapon, he never had a meeting with appellant, CPL Quintal, and SPC Winfield to transfer the AK-47 from appellant's squad to his Stryker. He asserted that he did not put the weapon in his Stryker, and that CPL Quintal told him that CPL Morlock had placed it there. He also testified that when he came back from leave in late February 2010 the AK-47 was no longer in his Stryker and he never saw it again. CPL Morlock told him the AK-47 had been used in a murder at Kari Kheyl and CPL Morlock told him "[SPC] Wagnon had come up after the incident at Kari Kheyl."

### 2. The CA Did Not Abuse His Discretion When He Denied Appellant's Request for a Post-Trial Hearing

Post-trial sessions may be directed by the military judge or CA for the "purpose of inquiring into, and when appropriate, resolving any matter that arises after trial and that substantially affects the legal sufficiency of any findings of guilty or the sentence." R.C.M. 1102(b)(2). A military judge may direct a post-trial session any time prior to authenticating the record, after which the convening authority may direct a post-trial session prior to taking initial action. R.C.M. 1102(d). "When an appellant requests the [CA] to order a post-trial Article 39(a) session, it is a matter for the [CA's] sound discretion whether to grant the request." *United States v. Ruiz*, 49 M.J. 340, 348 (C.A.A.F. 1998). "We review a [CA's] decision not to grant a post-trial hearing for an abuse of discretion." *United States v. Lofton*, 69 M.J. 386, 391 (C.A.A.F. 2011) (citing *Ruiz*, 49 M.J. at 348).

---

[15] Based on the *DuBay*, appellant and this court have the benefit of the testimony appellant sought in a post-trial hearing from the CA.

"The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54. M.J. 120, 130 (C.A.A.F. 2000) (citations omitted) (describing the abuse of discretion standard of review within the context of a military judge's ruling on the admissibility of evidence); *United States v. Travers*, 25 M.J. 61, 62-63 (C.M.A. 1987) (describing the abuse of discretion standard within the context of a military judge's decision not to close the trial to the public upon the motion of an accused).

Appellant cites *Lofton* and *Ruiz* for the proposition that "[t]o determine whether a convening authority abused his discretion, this court must determine whether the factual assertions in support of a request for a post-trial hearing proffered by defense counsel were 'unsubstantiated' or not." We disagree. We do not read *Lofton, Ruiz*, or the plain language of the rule to be so limiting. In *Lofton* our superior court determined that a CA's denial of a request for a post-trial Article 39(a) session, following a substantiated claim of a failure to follow Air Force policy rules requiring witness sequestration, was an abuse of discretion. 69 M.J. at 391-92. However, the CAAF's holding in the case is composed of two independent clauses:

> Under all the circumstances, we conclude that the defense
> claim is not unsubstantiated, and the convening authority
> abused his discretion in not ordering a post-trial hearing to
> inquire into Ms. King's allegations and its effect, if any,
> on [Lofton's] court-martial.

*Id.* at 392. The CAAF never asserted a causal relationship between these two independent clauses. While in its recitation of the legal standard in *Lofton*, the CAAF reiterated it's holding in *Ruiz* that "[a CA] is not 'compelled' to grant a post-trial hearing 'based merely on unsworn, unsubstantiated assertions[,]'" it never asserted or held that a convening authority *must* grant a post-trial hearing based on a substantiated assertion.[16] *Id.* at 391 (quoting *Ruiz*, 49 M.J. at 348.

Indeed, the plain language of the rule uses the term "may" not "shall," granting the CA discretion. *See* R.C.M. 1102(d). "'Discretion,' by definition, involves the idea of choice, of an exertion of the will, of a selection between

---

[16] Further, an analogous framework for determining when a post-trial evidentiary hearing is required already exists, albeit within the context of appellate claims requiring further fact-finding. *See United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). As the CAAF asserted with respect to *DuBay* hearings, "a post-trial evidentiary hearing . . . is not required in any case simply because an affidavit is submitted by an appellant." *Id*. at 248.

competing considerations." *United States v. Glenn*, 154 U.S. App. D.C. 61, 473 F.2d 191, 196 (D.C. Cir. 1972) (Robinson, J., dissenting) (citing *Spalding v. Spalding*, 355 Mich. 382, 94 N.W.2d 810, 811 (1959). Dicta in *Ruiz* also supports the conclusion that, even with a substantiated claim, the CA still has a choice on whether or not to order a post-trial Article 39(a) session, asserting: "The existence of factual support for a post-trial Article 39(a) session might *persuade* the [CA] to consider whether further inquiry is appropriate." *Ruiz,* 49 M.J. at 348 (emphasis added).

Further, whether a defense counsel has provided factual support for the defense's claim is only one characteristic regarding whether a post-trial Article 39(a) session is appropriate within the rule's purpose. Any evaluation of whether a convening authority abused his discretion by failing to order a post-trial Article 39(a) session would have to consider the specific context of the purpose asserted in R.C.M. 1102. In essence, the rule's purpose is 1) an inquiry into or resolution of an issue, 2) that arises after trial, and 3) that substantially affects the legal sufficiency of any findings of guilty or the sentence.

Here, the CA had the benefit of appellant's 1105 matters, the SJA's SJAR and three addendums addressing the request for a post-trial session before taking initial action. The CA also had the benefit of the record of trial that supported the guilty findings and appellant's sentence. Additionally, unlike *Lofton*, here we are dealing with a request for a post-trial Article 39(a) session to take testimonial evidence from two co-accuseds after trial. Unlike the evidence in *Lofton* showing a failure to follow Air Force witness sequestration rules which was discovered after trial, the existence of the co-accuseds was something that was known before trial, and their testimony could have been pursued both through written requests for immunity and through subsequent motions to the military judge based on R.C.M. 704(e). It was not. Under such circumstances, a decision to deny a request for a post-trial Article 39(a) session cannot be said to have been "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous."

Specialist Wagnon signed a statement that he swore was true. However, the statement was self-serving and contained nothing more than a general denial of wrongdoing, bolstering appellant's own assertions that the shooting at Kari Kheyl was a lawful engagement, and asserting CPL Morlock was a liar. First, at the time of the CA's decision, it is unclear what, if any, additional useful details would have been inquired into during a post-trial Article 39(a) session in which SPC Wagnon would have asserted the exact same thing. Second, the issue of presenting SPC Wagnon's testimony appears to have been an issue that would have been ripe at trial, not something that arose after trial. Third, while SPC Wagnon's statement asserted

Kari Kheyl was a lawful engagement, it would not have substantially affected either the legal sufficiency for this specification or the sentence in light of the other evidence presented at trial, to include PFC Willis' testimony,[17] appellant's admission to SSG Stevens about the unlawful killing, the inconsistencies in appellant's own testimony, SSG Sprague's testimony regarding the AK-47 having no round in the chamber and being fully operational, and SPC Winfield's Facebook messages to his parents.

With respect to SSG Bram, the CA had conflicting information. He had a proffer from defense counsel regarding what SSG Bram would say if called to testify. He also had a sworn affidavit from a TC contradicting this proffer. Staff Sergeant Bram did not himself provide a written statement of any type for the CA's consideration. First, the defense's proffer for SSG Bram appears to be the exact type of request where a CA is "not compelled to grant a post-trial Article 39(a) session based merely on unsworn, unsubstantiated assertions." *Ruiz*, 49 M.J. at 348. Second, as with SPC Wagnon, the issue of presenting SSG Bram's testimony appears to have been an issue that would have been ripe at trial, not something that arose after trial. Third, the only substantiated information the CA had regarding SSG Bram's potential testimony was aptly summarized by the SJA. While SSG Bram disputed SPC Winfield's recollection of how the squad came into possession of the weapon, he also admitted having the AK-47 in his Stryker, that the weapon was intended to be used as a drop weapon after killing an unarmed Afghan, and the weapon was no longer in his vehicle after the Kari Kheyl murder. This information in the context of the trial would not have substantially affected either the legal sufficiency for this specification or the sentence.

We therefore determine the CA did not abuse his discretion when he decided to deny granting a post-trial Article 39(a) session. While we determine there was no error and thus no prejudice could have ensued, we further recognize that when we ordered the *DuBay* hearing, this essentially mooted the request for the CA to direct a post-trial session.

---

[17] Private First Class Willis' testimony at trial directly contradicts both appellant's assertion at trial and SPC Wagnon's assertion at the *DuBay* hearing that CPL Morlock was not a part of the shooting at Kari Kheyl. Private First Class Willis not only testified he saw CPL Morlock and SPC Wagnon at the entryway to the alley, but testified he saw CPL Morlock "fire off a couple rounds because [CPL Morlock] was the first one to notice contact, and then – it was him and Wagnon on that wall."

### 3. *The Government Did Not Commit A Post-Trial Brady Violation*

Appellant avers the government committed a post-trial *Brady* violation when it failed to disclose the contents of the interview prosecutors conducted with SSG Bram after appellant's trial. The government ultimately provided the defense with an affidavit summarizing the interview. The defense objected to both the summarized nature and content of the affidavit contending it did not contain and mischaracterized SSG Bram's actual statements. Based on a proffer from SSG Bram's attorney regarding the statements made in the interview, appellant specifically requested the prosecution's notes of the interview. The government refused to provide the attorney interview notes. This all occurred prior to the CA taking action in appellant's case.

### a. *What the Government Learned in the Interview*

Evidence at the *DuBay* hearing established the government interviewed SSG Bram approximately two months after appellant's trial. Shortly thereafter, the government trial team lost the notes taken contemporaneously with the interview. However, one of the trial counsel sent an e-mail to the prosecution team the day of the interview. Among other things, the e-mail summarized that SSG Bram was aware that an AK-47 was hidden in his Stryker and he knew before the shooting at La Muhamad Kalay that CPL Morlock and SPC Holmes were planning to commit murder. The e-mail also stated that upon SSG Bram's return from mid-tour leave CPL Morlock told SSG Bram both that the Kari Kheyl shooting was a murder and that SPC Wagnon did not show up to the crime scene at Kari Kheyl until after the killing occurred.

### b. *What Was Disclosed in the Trial Counsel Affidavit*

The affidavit provided to the defense prior to the convening authority taking action in appellant's case stated SSG Bram was aware an AK-47 was stored in his vehicle for criminal activity and that at one point SSG Bram and CPL Quintal agreed to use this weapon to murder the next Afghan that drove past their Stryker on a motorcycle. It also asserted: "Further, [SSG Bram] stated that [SPC] Winfield's version of how [SSG Bram's] squad came into possession of the AK-47 was incorrect. The Government is unclear as to how the AK-47 ended up in [SSG] Bram's Stryker as both [CPL] Quintal and [SPC] Winfield have different accounts as to what occurred."

### c. *What Brady Requires Post-Trial*

The government violates *Brady* when they withhold favorable and material information from the defense. *United States v. Behenna*, 71 M.J. 228, 237-38 (C.A.A.F. 2012). Withholding evidence requires the government suppress the

evidence "either willfully or inadvertently." *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence is favorable if, among other things, it impeaches the government's case. *Behenna*, 71 M.J. at 238. "Evidence is material when 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (further quotations omitted)). We recently recognized that "[b]ecause '*Brady* evidence' has the twin requirement that the evidence be both favorable and material, a *Brady* violation is *always* prejudicial." *United States v. Ellis*, 77 M.J. 671, 675 (Army Ct. Crim. App. 27 March 2018), *rev. denied*, __ M.J __, 2018 CAAF LEXIS 334 (C.A.A.F. 18 Jun. 2018).

In *United States v. Hawkins*, this court determined the government's *Brady* obligations continue post-trial until the CA takes initial action. 73 M.J. 605, 612 (Army Ct. Crim. App. 2014), *rev. denied*, 73 M.J. 448 (C.A.A.F. 2014). However, the materiality of a post-trial *Brady* violation is not evaluated from the perspective of the materiality of the evidence to the findings and sentence, but rather it's materiality to the post-trial proceedings. *See Hawkins*, 73 M.J. at 613. In *Hawkins*, this court evaluated the materiality of the government's failure to timely disclose favorable evidence discovered post-trial from the perspective of an appellant's inability to use the information to request a remedy from the convening authority. *Id.* at 613-14.

### d. Although the Evidence Was Favorable, It Was Not Material

As a preliminary matter, SSG Bram's testimony was favorable to appellant with respect to two potential lines of impeachment. First, SSG Bram testified that he was not present when the AK-47 was transferred to his vehicle and that CPL Quintal informed him that CPL Morlock had put the weapon in the Stryker. This testimony differed from SPC Winfield's, CPL Quintal's, and CPL Morlock's testimony at trial. Second, SSG Bram's assertion that CPL Morlock informed him "[SPC] Wagnon had come up after the incident at Kari Kheyl" potentially differed from CPL Morlock's testimony at trial. Under *Hawkins* the government had a duty to disclose this favorable evidence to the defense upon discovery. As such, with or without a defense request, the information should have been timely disclosed by the government after the interview occurred.

Admittedly, the first potential line of impeachment was generally provided to the defense in the trial counsel's affidavit.[18] Importantly, this disclosure occurred

---

[18] We also recognize that it is still unknown whether SSG Bram actually disclosed in the interview that CPL Quintal told him CPL Morlock put the AK-47 in the Stryker.

(continued . . .)

prior to the convening authority's action such that the disclosure, albeit late, could have negated any *Brady* claim. However, given the complexities involved in this particular case, we determine this general disclosure was not enough and did not contain the favorable information that CPL Quintal had stated it was CPL Morlock who placed the AK-47 in the vehicle.[19] Further, the second line of impeachment evidence was clearly known to the government and remained undisclosed.

Despite the government's failure to disclose these two lines of favorable evidence, none of the testimony SSG Bram provided at the *DuBay* hearing was material such that there was a reasonable probability of a different result with respect to the convening authority's initial action. Although aspects of SSG Bram's testimony were favorable to the defense, in the context of appellant's trial SSG Bram's testimony on the whole had limited impeachment value and was actually damaging.

With respect to the first line of impeachment, the value of SSG Bram's testimony regarding how the AK-47 ended up in the bread box of his Stryker is undermined by the fact that he did not actually know how the weapon ended up in his Stryker and CPL Quintal's, SPC Winfield's, and CPL Morlock's versions of events already differed from each other. Corporal Quintal testified that after the La Muhamad Kalay murder, appellant asked him for the keys to his Stryker and the next day he found the AK-47 in his Stryker. In contrast, SPC Winfield testified that SPC Corey Moore brought an AK-47 from the ANP IED site onto first squad's Stryker and later he, appellant, SSG Bram, and CPL Quintal all met to transfer the AK-47 from appellant's Stryker to SSG Bram's Stryker. Still differently, CPL Morlock testified that it was appellant, not SPC Corey Moore, who acquired the AK-47 from the ANP IED site and later he, appellant, SSG Bram and CPL Quintal transferred the weapon from first squad to third squad's vehicle.

---

(. . . continued)
Given the length of the five-hour interview and the content of the government's general disclosure in the affidavit, we determine SSG Bram did disclose more details about the inconsistencies between CPL Quintal and SPC Winfield regarding who placed the AK-47 in the Stryker.

[19] We make this determination bearing in mind that defense counsel specifically attempted to obtain the information himself by flying to the Consolidated Naval Brig at Miramar to interview SSG Bram, but was prevented by SSG Bram's attorney from conducting the interview. The defense ultimately requested the convening authority grant a post-trial Article 39(a) for specifically determining the exact content of SSG Bram's post-trial testimony.

Further, SSG Bram's testimony that he was not present at any transfer of the AK-47 to his vehicle was limited to impeaching SPC Winfield and CPL Morlock's testimony as substantive evidence that he, SSG Bram, was indeed not at any meeting as they claimed. His testimony does not definitively state that a meeting never occurred; just that if one did occur, he was not present. Staff Sergeant Bram's statement that CPL Quintal told him that CPL Morlock placed the AK-47 in the Stryker was only admissible as a prior inconsistent statement to question the veracity of CPL Quintal's testimony. It was not admissible as substantive evidence that CPL Morlock did indeed place the AK-47 in the vehicle. Frankly, it is not even entirely inconsistent with CPL Quintal's statement.

Yet, exactly how the AK-47 came to reside in the bread box of SSG Bram's Stryker is an ancillary point. Even SSG Bram agreed that the AK-47 was stored in his Stryker for use as a drop weapon. Defense counsel's cross-examination for each of the witnesses with respect to the AK-47 was properly focused on undermining any testimony suggesting the AK-47 that was in the Stryker was the same AK-47 at Kari Kheyl. In this respect, SSG Bram's testimony was actually damaging to the defense case. Staff Sergeant Bram confirmed that the AK-47 that had been in his vehicle was no longer there when he returned from mid-tour leave in late February 2010, just after the Kari Kheyl incident, and that he never saw the weapon after his return. He further provided damning testimony that CPL Morlock told him during the ongoing conspiracy that the AK-47 from the vehicle had been used in the murder at Kari Kheyl. This statement was admissible as a prior consistent statement both to refute recent fabrication and for its truth.

This brings us to the second potential point of impeachment, SSG Bram's testimony at the *DuBay* hearing that CPL Morlock told him "[SPC] Wagnon had come up after the incident at Kari Kheyl." This statement is vague and could be interpreted any number of ways. It could potentially be used as a prior inconsistent statement to impeach CPL Morlock's testimony that he, appellant, and SPC Wagnon discussed killing the Afghan at Kari Kheyl before committing the murder together. Under this interpretation the statement was admissible only for determining CPL Morlock's credibility. However, the statement could also be interpreted such that SPC Wagnon "[came] up" just after appellant shot the Afghan. This interpretation would actually be consistent with both CPL Morlock's and appellant's own version of events as each in his testimony differed with respect to whether CPL Morlock was there, not whether SPC Wagnon was there. We further note this is consistent with PFC Willis' testimony that "[SPC] Wagnon was behind [CPL Morlock]" when CPL Morlock fired rounds. As a prior consistent statement, the government could have used SSG Bram's testimony as substantive evidence. Indeed, nothing, to include SPC Wagnon's testimony at the *DuBay* hearing, ever suggested that SPC Wagnon was not there. Specialist Wagnon also stated he came into the compound after shots were fired.

35

None of this negates the Brechtian discord between appellant's own tactical proficiency gained through combat experience and his story of being lackadaisical such that he was caught unaware while in the midst of what he claimed to be a search of a known Taliban Commander's compound. Indeed, in the broader context of the trial as a whole, exactly how the AK-47 ended up in SSG Bram's Stryker and the possible contradiction by CPL Morlock that SPC Wagnon was not in the compound at Kari Kheyl seem inconsequential facts amongst the other evidence which established the AK-47 drop weapon that appellant retrieved at the ANP IED site ended up next to the unarmed Afghan that appellant killed. This testimony does not overcome the inconsistency between appellant's story of the Taliban Commander's AK-47 jamming and SSG Sprague finding the weapon next to the Afghan without a round in the chamber and fully functional.

If it did nothing else, SSG Bram's testimony at the *DuBay* hearing confirmed that the platoon had within its possession an AK-47 that was specifically kept for use as a drop weapon. That SSG Bram asserted this drop weapon just so happened to disappear from his Stryker and the unit's possession upon his return from leave, just after Kari Kheyl, seems particularly damaging to appellant's cause. This is even without considering SSG Bram's testimony about CPL Morlock's admission that the AK-47 was used to stage the murder at Kari Kheyl. This aspect of SSG Bram's testimony corroborates the damning text of SPC Winfield's 2010 Valentine's Day message memorializing appellant's relationship to both the conspiracy and weapon approximately eight days prior to the murder.

Thus, although the government failed to disclose favorable information to the defense, the government did not commit a *Brady* violation as there is no reasonable possibility SSG Bram's testimony would have affected the convening authority's action effectively denying the post-trial hearing.

### e. Specific Requests and United States v. Hart

Appellant contends he made a specific request in his clemency materials for the content of SSG Bram's testimony and the trial counsel notes from the interview. He asserts that because of this request the government must prove the non-disclosure was harmless beyond a reasonable doubt under our superior court's decision in *United States v. Hart*, 29 M.J. 407 (C.M.A. 1990).

First, we recognize "[t]he regulatory and statutory discovery rights of an accused at court-martial are greater than the minimum prescribed by the constitution." *Ellis*, 77 M.J. at 677. However, unlike post-trial *Brady* violations, this court has not yet had occasion to determine whether the requirements of Article 46, UCMJ, and the discovery obligations of the 700 series of the Rules for Courts-Martial continue to apply post-trial. Our rationale for applying *Brady* in the military post-trial context through initial action is certainly persuasive for similarly applying

these heightened statutory and regulatory requirements post-trial.[20] However, we are also confronted with the regulatory title under which the president has implemented the specific discovery requirements underpinning *Hart*: "CHAPTER VII. PRETRIAL MATTERS." *See Yates v. United States*, 135 S. Ct. 1074, 1083 (2015) (recognizing while "headings are not commanding, they supply cues" with respect to a drafter's intent). We also recognize that while appellate discovery rights exist, they are presently unmoored from any statutory or regulatory framework, relying exclusively on case law. *See United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002). Regardless, a non-disclosure under any such continuing requirements that might possibly exist would have no effect on the trial itself as the violation would have occurred post-trial. Thus, any potential heightened scrutiny analysis would necessarily require evaluating whether the information was harmless beyond a reasonable doubt with respect to the convening authority's action, rather than trial.

Second, it would not matter that the defense made a specific request for the prosecution's notes of this interview if the defense was not entitled to the notes. *Ellis*, 77 M.J. at 679 ("To provide relief to appellant we must first find that the government was required to disclose the information under the Constitution, the UCMJ, or the Manual for Courts Martial."). Rule for Courts-Martial 701(f) clearly states, "[n]othing in this rule shall be construed to require the disclosure of information protected from disclosure by the Military Rules of Evidence [Mil. R. Evid.]. Nothing in this rule shall require the disclosure or production of notes, memoranda, or similar working papers prepared by counsel or counsel's assistants and representatives."[21] Neither the Supreme Court nor the CAAF has decided whether *Brady* requires a prosecutor to disclose work product. The Eleventh and Ninth circuits have determined *Brady* does not require a prosecutor disclose "opinion work product," encompassing material that only contains an attorney's mental impressions or legal theories. *See Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000); *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006).

---

[20] Although persuasive, we also recognize the CA's powers under Article 60 on which the rationale of *Hawkins* in part relies have been substantially eroded through statutory change. 73 M.J. at 612; *Compare* UCMJ art. 60 (2006) *with* UCMJ art. 60 (2016).

[21] Article 46 and R.C.M. 701 do not require the open and reciprocal discovery of attorney work product between the parties. For example, it would have been equally objectionable and outside the discovery obligations under Article 46 for the government to request defense counsel interview notes from an alibi witness or other defense witness.

However, if exculpatory information is contained in attorney work product, the underlying exculpatory facts from the information must be disclosed to the defense. *See United States v. Kohring*, 637 F.3d 895, 907 (9th Cir. 2011) ("'[I]n general, a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady*[/Giglio] unless they contain underlying exculpatory facts.'" (quoting *Morris*, 447 F.3d at 742 ) (alterations in original).  Under such an approach an affidavit that sufficiently contains the details of any statements made in an interview would suffice.  This approach makes sense to us, but has yet to be decided in the military for pretrial discovery obligations, let alone decided in the post-trial context.

However, we need not decide either of these issues today as the government's failure to disclose the specific contents of SSG Bram's post-trial statements was harmless beyond a reasonable doubt for the exact same reasons the evidence in issue was not material.  The damning confirmations of SSG Bram's testimony outweighed the favorable nature of the limited impeachment he provided.  We are convinced the non-disclosure was harmless beyond a reasonable doubt, even more so, in light of the context of the entire trial.  As explained in our review of the factual sufficiency of the case, appellant's own admissions, the use of the AK-47 as a drop weapon, explanations of stock-piling unauthorized weaponry, explanations for hoarding severed fingers, and of the unfolding of each event destroyed his own credibility.  When we consider the procedural history of the defense not submitting a written immunity request to the CA and not raising any potential immunity request with the military judge, it is clear the issue of SSG Bram testifying was waived at trial.  Any post-trial non-disclosure was therefore harmless beyond a reasonable doubt.

Lastly, assuming arguendo that *Hart* should be applied to post-trial non-disclosure violations of specific requests and further assuming the error in this case was not harmless beyond a reasonable doubt, the appropriate remedy would be to return the record of trial to the convening authority for a review and action in light of SSG Bram's *DuBay* testimony.

### 4.  Appellant Never Asked for a New Trial Pursuant to R.C.M. 1210 and Has Failed to Meet the Statutory Requirements

An accused may petition the Judge Advocate General for a new trial at "any time within two years after approval by the convening authority of a court-martial sentence . . . on the grounds of newly discovered evidence or fraud on the court." *See* UCMJ, art. 73.  During oral argument, considerable time was spent discussing whether or not this court should simply address appellant's asserted errors as a request for a new trial based upon newly discovered evidence. *See* R.C.M. 1210; *see also United States v. Thomas*, NMCM 88 3996C, 1989 CMR LEXIS 1087 (N.M.C.M.R. 20 Dec. 1989) ("For our purposes in resolving the assignment of error and request for new trial, we will consider the affidavits and brief submitted by the

appellant to constitute a petition for a new trial, despite the lack of compliance with certain provisions of R.C.M. 1210(c).").  However, at no time did appellant actually submit a petition requesting a new trial.  *See* R.C.M. 1210(c).

After careful consideration of the record of trial, to include appellant's post-trial submissions to the CA and the record from the *DuBay* hearing, we decline to exercise our discretion to construe appellant's assigned errors as a petition for a new trial.  This is especially true since appellant was not time barred under Article 73 when he filed his appeal with this court.  Appellant was not precluded from both raising his assigned errors and petitioning for a new trial based on the evidence available to him at the time.  As there was no actual request for a new trial, we hold there is no remedy available pursuant to R.C.M. 1210.  Even if we were to view appellant's assignments of error as such a request, the testimony provided by SPC Wagnon and SSG Bram fails all three prongs required for relief.

*a. Requirements for Granting a New Trial*

In order to grant a new trial based on newly discovered evidence a petitioner must show that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2).

"[T]he reviewing court must make a credibility determination, insofar as it must determine whether the 'newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.'"  *United States v. Luke*, 69 M.J. 309, 314 (C.A.A.F. 2011) (quoting *United States v. Brooks*, 49 M.J. 64, 69 (C.A.A.F. 1998) (citation omitted)).  "The reviewing court does not determine whether the proffered evidence is true; nor does it determine historical facts.  It merely decides if the evidence is sufficiently believable to make a more favorable result probable."  *Id*.

The CAAF has emphasized that "requests for a new trial, and thus rehearings and reopenings of trial proceedings, are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial, rehearing, or reopening based on proffered newly discovered evidence." *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993) (citations omitted).

### b. The Evidence Was Not "Discovered" After Trial

There is a split among the federal courts of appeals regarding whether a co-actor's post-conviction statement, exculpating an appellant, that was previously unavailable due to the co-actor's invocation of his privilege against self-incrimination is "newly discovered" evidence or merely "newly available." *Compare United States v. Montilla-Rivera*, 115 F.3d 1060 (1st Cir. 1997) *with United States v. Owen*, 500 F.3d 83 (2d Cir. 2007). At the *DuBay* hearing, appellant argued for adopting *Montilla-Rivera* to determine the evidence from SPC Wagnon and SSG Bram was "newly discovered." The government argued for adopting the "decided majority" rule in *Owen* to determine the evidence was, at most, "newly available." There is no binding military or Supreme Court precedent that has decided this issue.

In *Montilla-Rivera*, the court concluded that testimony from a co-actor that was unavailable due to the co-actor's invocation of his privilege against self-incrimination could be "newly discovered" if, in addition to meeting the other requirements to petition for a new trial, the defendant showed that the evidence was "unknown or unavailable" at the original trial. 115 F.3d at 106-66 (relying on *Vega Pelegrina v. United States*, 601 F.2d 18, 21 (1st Cir. 1979) ("newly discovered" language of Federal Rule of Criminal Procedure [Fed. R. Crim. P.] 33 encompasses evidence that was "unavailable.")) The *Montilla-Rivera* court reasoned this approach was consistent with two other circuits' treatment of unavailable witnesses that were not co-defendants. *See United States* v. *Garland*, 991 F.2d 328, 335 (6th Cir. 1993) (ordering new trial where "although the defense knew of [witness's] existence before and during the trial, [the witness] was not located until after the trial."); *United States* v. *Ouimette*, 798 F.2d 47, 51-52 (2d Cir. 1986) (ordering hearing on new trial where a witness, while known of at trial, was unavailable after police allegedly pressured him not to testify).

In contrast, the *Owen* court concluded, "when a defendant is aware that his codefendant could provide exculpatory testimony but is unable to obtain that testimony because the codefendant invokes his privilege against self-incrimination prior to and during trial, the codefendant's post-conviction statement exculpating the defendant is not 'newly discovered evidence' within the meaning of [Fed. R. Crim. P.] 33" 500 F.3d. at 88 (citing *United States v. Jasin*, 280 F.3d 355, 368 (3d Cir. 2002); *United States v. Metz*, 652 F.2d 478, 480 (5th Cir. 1981); *United States v. Glover*, 21 F.3d 133, 138 (6th Cir. 1994); *United States v. Theodosopoulos*, 48 F.3d

1438, 1448 (7th Cir. 1995); *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992); *United States v. Muldrow*, 19 F.3d 1332, 1339 (10th Cir. 1994); *United States v. DiBernado*, 880 F.2d 1216, 1224 (11th Cir. 1989)); *See also United States v. Griffin*, 489 Fed. Appx. 679, 681 (4th Cir. 2012); *United States v. Rodgers*, 982 F.2d 1241, 1245 (8th Cir. 1993); *United States* v. *Dale*, 991 F.2d 819, 838-39 (D.C. Cir. 1993).

The majority has declined to follow "the First Circuit's approach because it is inconsistent with the plain and unambiguous term 'newly discovered evidence' found in [Fed. R. Crim. P.] 33(b)(1)." *Griffin*, 489 Fed. Appx. at 681; *See, e.g., Jasin*, 280 F.3d at 368 (rejecting defendant's argument that "newly available evidence" is synonymous with "newly discovered evidence" for purposes of Fed. R. Crim. P. 33 on the basis that such argument "cannot overcome the unambiguous language of Rule 33, which contemplates granting of new trial on the ground of 'newly discovered evidence' but says nothing about newly available evidence"). The *Owen* court held in accordance with the plain meaning of the term discover that "[o]ne does not 'discover' evidence after trial that one was *aware of* prior to trial. To hold otherwise stretches the meaning of the word 'discover' beyond its common understanding." 500 F.3d at 89-90 (citing *Webster's Third New Int'l Dictionary* 647 (2002) for the definition of "discover" as "to make known (something secret, hidden, unknown, or previously unnoticed)").

After reviewing both approaches, we choose to follow *Owen*. We conclude that almost all of the evidence from SPC Wagnon and SSG Bram was not "discovered after the trial" but merely became available after trial. The *Owen* rule is the majority approach of federal courts and is also consistent with the plain and unambiguous term of "newly discovered evidence" contained in Article 73, UCMJ.

Here, the majority of SPC Wagnon's testimony at the *DuBay* hearing revolved around the incident at Kari Kheyl. By the time of appellant's trial, the government and defense counsel knew generally that SPC Wagnon would testify that the alleged murder at Kari Kheyl was a "good shot" and was justified. This potential exculpatory testimony was the reason SPC Wagnon attended appellant's trial in his dress uniform. Moreover, appellant cannot be said to have been unaware of SPC Wagnon's ability to provide exculpatory testimony. Importantly, the *Owen* court did not rely on knowledge of the actual testimony, but on an awareness of the *ability* to provide exculpatory testimony. *See* 500 F.3d at 91. Appellant was at Kari Kheyl and well knew the role SPC Wagnon played in the shooting. Appellant knew what happened and thus, appellant was at all times aware of SPC Wagnon's ability to provide potentially exculpatory information. He simply was unable to benefit from the testimony because he did not seek to make it available until after the trial was over. This directly parallels the circumstances of *Owen*, and we decline to find such similar circumstances to constitute newly discovered evidence within the meaning of Article 73, UCMJ.

The only portion of SPC Wagnon's testimony that appellant may not have been aware of prior to trial that could have been "discovered" was also inadmissible evidence. Specialist Wagnon's testimony that SPC Winfield told him that SPC Winfield overheard CPL Quintal, PFC JS, and CPL Morlock say they would "pin everything" on appellant was hearsay within hearsay. While Mil. R. Evid. 803(3) may have provided an exception for admitting the statement from SPC Winfield, there is no similar exception that would allow SPC Wagnon to recount what SPC Winfield told him. Even as a prior inconsistent statement, the defense would first have to confront CPL Quintal, PFC JS, or CPL Morlock and then the evidence of the prior inconsistent statement would be testimony from SPC Winfield who overheard the comment, not SPC Wagnon. In this evidence and impeachment exercise, SPC Wagnon is simply one step too far removed to have provided admissible evidence.

This brings us to SSG Bram. Appellant was aware of the ability of SSG Bram to provide impeachment testimony. Appellant knew whether or not he, himself, was present for any averred meeting that SPC Winfield and CPL Morlock testified occurred between themselves, appellant, CPL Quintal and SSG Bram. Even without knowing whether SSG Bram had attended any such meeting, knowing the status of his own attendance, appellant knew about the ability of SSG Bram's testimony to conflict with SPC Winfield and CPL Morlock's version of events. The only portion of SSG Bram's testimony that appellant may have been unaware of prior to trial was the particular statements CPL Morlock made to SSG Bram.

Thus, in line with the majority rule in *Owen*, we find the only admissible evidence "discovered" after trial was CPL Morlock's statement to SSG Bram about SPC Wagnon's time of arrival after the Kari Kheyl shooting and CPL Morlock's admission that the AK-47 was used to stage the murder at Kari Kheyl. The rest of SPC Wagnon's and SSG Bram's testimony is either inadmissible or merely became available after appellant's trial. Furthermore, even if we were to assume the evidence from SPC Wagnon and SSG Bram was newly discovered, appellant's defense counsel did not exercise due diligence to discover the evidence at the time of appellant's trial.

### c. The Evidence Could Have Been Discovered at the Time of Trial, the Defense Simply Chose Not to Pursue It

The second requirement of R.C.M. 1210(f)(2) requires "[t]he evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence." A co-accused's invocation of his Fifth Amendment right against self-incrimination is not a per se bar to discovery of the co-accused's testimony. Indeed, R.C.M. 704(e) not only provides the CA with the ability to immunize a co-accused, rendering such testimony discoverable, but provides a mechanism for judicial review of the CA's decision to deny a defense request for immunity. Here, the defense chose not to avail themselves of either of these

options. Appellant's defense counsel never submitted a written request for the CA to immunize SPC Wagnon or SSG Bram. While we recognize this fact is highly disputed by the defense, it is beyond dispute that appellant never sought remedy from the military judge to make either the testimony of SPC Wagnon or SSG Bram available at his trial. Instead, the defense opted for a reasonable trial strategy of arguing the absence of evidence presented by the government's failure to have these witnesses testify.[22]

### d. The Probability of a Substantially More Favorable Result for Appellant

The final requirement to obtain relief under R.C.M. 1210(f)(2) is that "[t]he newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." This court does not have to determine if SPC Wagnon's or SSG Bram's testimony is true. Instead, we must determine whether SPC Wagnon and SSG Bram's testimony is sufficiently believable to make a more favorable result probable in the light of all other pertinent evidence at appellant's trial. *See Luke*, 69 M.J. at 314; *Brooks*, 49 M.J. at 68.

"[P]ost-trial attempts by co-actors to exonerate one or the other should be viewed with extreme suspicion." *Brooks*, 49 M.J. at 68 (quoting *United States v. Bacon*, 12 M.J. 489, 492 (C.M.A. 1982)). If SPC Wagnon testified at trial, he would have been cross-examined about his motive to fabricate. His testimony about Kari Kheyl would have been weighed against that of CPL Morlock, testimony of the other witnesses, and the other physical and circumstantial evidence presented at trial. This evidence, included among other evidence, appellant's admissions to other witnesses about the murders, appellant obtaining and using the AK-47 as a drop weapon, the substantial inconsistencies within appellant's own testimony regarding

---

[22] On appeal, appellant has not assigned as error an allegation of ineffective assistance of counsel. Based on our review of SSG Bram's and SPC Wagnon's testimony at the *DuBay* hearing and our review of the record of trial, we do not find any basis to overcome the strong presumption that counsel "have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement." *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). We recognize there is a wide chasm between failing to exercise due diligence to discover evidence at trial and whether it is constitutionally deficient performance not to attempt to discover that particular evidence at all. Indeed, sometimes it is a more prudent strategy to argue an absence of evidence, rather than discover evidence that may then be used to further the government's cause. Additionally, during the *DuBay* hearing, appellant told the military judge he thought his defense counsel was diligent and he did not think his counsel was ineffective at trial.

appellant's tactical combat experience and implausible actions while clearing a Taliban Commander's compound. In light of SSG Sprague's credible testimony that the AK-47 did not have a round in the chamber and was fully functional, and SPC Winfield's messages to his parents confirming appellant's relationship to both the AK-47 and conspiracy just prior to the murder, SPC Wagnon's testimony regarding Kari Kheyl is not sufficiently believable to make a more favorable result probable. Specialist Wagnon's other testimony regarding the conversation he had with SPC Winfield would have been inadmissible.

While portions of SSG Bram's testimony were sufficiently believable, it does not make a more favorable result probable. The testimony had limited impeachment value and overall was damaging in appellant's case. As previously discussed, SSG Bram's testimony would have provided limited impeachment evidence focused on one piece of the timeframe of the AK-47's whereabouts and one potential inconsistent statement by CPL Morlock. His testimony also would confirm that the AK-47 was stored in his Stryker for use as a drop weapon and it was no longer there upon his return from leave. SSG Bram also would have provided the government with a prior consistent statement to bolster CPL Morlock's testimony that the AK-47 was specifically used at the Kari Kheyl shooting. This statement was made before CPL Morlock would have had a motive to fabricate the allegations against appellant.

Lastly, the evidence presented against appellant was overwhelming when compared with the potential impeachment value of the evidence provided by SPC Wagnon and SSG Bram. Considering all the other evidence presented at appellant's trial, evidence from SPC Wagnon and SSG Bram was unlikely to produce a "substantially more favorable result for appellant." R.C.M. 1210(f)(2)(C).

### CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence are correct in law and fact and are AFFIRMED.

Chief Judge BERGER and Senior Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court